# Sheridan v. The State.

## *Larceny.*

(Decided June 19, 1912.    59 South. 735.)

*Larceny; Evidence.*—Where the evidence tended to show that the defendant, who was a small trader, stole a hack and took it to town and sold it, it was error to admit the testimony of an accomplice, that at the same time they took saddles to town which came from a certain place, and harness which came from another place, in the absence of proof that these articles were stolen. Such testimony considered in connection with the testimony of a subsequent witness regarding other circumstances from which it might be inferred that the defendant undertook to get the witness to steal articles for him to sell, and that the persons living at the two places were also thieves in defendant's employment, tended to arouse in the minds of the jury a prejudice against the defendant, based on merely suspicious circumstances.

APPEAL from Morgan Circuit Court.

Heard before Hon. D. W. SPEAKE.

John Sheridan was convicted of grand larceny and he appeals. Reversed and remanded.

No counsel marked for appellant.

R. C. BRICKELL, Attorney General, and W. L. MARTIN, Assistant Attorney General, for the State.

DE GRAFFENREID, J.—The defendant was indicted for grand larceny, and the evidence tended to show that he and one Bains stole a hack, carried it to the city of Huntsville, and there sold it.

Against the objection of the defendant, the witness Bains—the accomplice—was, in answer to questions propounded by the state, permitted to testify that, when they carried the hack to Huntsville, they also carried two horses, two saddles, and some harness. Then, over the objection of the defendant, the witness was further permitted to testify that "the saddles came from Jeff Peck's house," and that the "harness came from a man's 'twixt here and defendant's house, a little low man—do not know his name." For the purpose of throwing light on the above testimony—we presume it was for the purpose—the solicitor, at a later stage of the proceedings, introduced one Roland Garth, who testified that on one occasion the defendant was in Hartselle, and, in substance, led him into a private conversation, and told the witness that he was engaged in selling "junk," and that if he would get him tobacco, clothes, and things like that he would pay him for them, intimating in the conversation that Bains was engaged in that character of business for him. It is plainly inferable from the witness' testimony that, if what he said was true, the defendant, in effect, undertook to get the witness to steal articles and deliver them to him for sale.

There was no evidence from which the jury had the legal right to infer that the saddles and harness above referred to were stolen, and yet the above evidence of the witness Bains, to which the defendant objected, taken in connection with that of the witness Roland Garth, was calculated to prejudice the jury against the defendant, "alarm their suspicions, incline them the more readily to believe in the guilt of the defendant, and render them less inclined to listen to whatever was offered or said in his defense."—*Gassenheimer v. State,* 52 Ala. 313. This is particularly true, when it is remembered that the evidence tends to show that the defendant was a small trader, that he sold the harness and the saddles on the trip to Huntsville, and came back, if the witness Bains is to be believed, with nothing that he carried away with him when he left home on the alleged trip with the hack. If the state had been confined, in its examination of the witness Bains, to the fact that, in addition to the hack, the defendant carried with him the horses, the saddles, and the harness, and that he sold them on the trip, we might hold that, as a part of the res gestæ, these facts were admissible in evidence, or that, at any rate, their admission was harmless. If the evidence had disclosed that the defendant and Bains stole the saddles and the harness, as there was some evidence from which an unlawful combination or conspiracy might have been found to have existed between Bains and the defendant, we might hold that such evidence was also admissible.—*Gassenheimer v. State,* 52 Ala. 313; *Allison v. State,* 1 Ala. App. 206, 55 South. 76, 103 Am. St. Rep. 17; *Curtis v. State,* 78 Ala. 12; *Commonwealth v. Turner,* 3 Metc. (Mass.) 19; *Frazier v. State,* 135 Ind. 38, 34 N. E. 817.

The fact, however, that "the saddles came from Jeff Peck's house" and the harness from the "house of a lit-

tle low man" had no legitimate tendency whatever to show that the defendant stole them, or knew that they were stolen when he obtained them, or that the defendant stole the hack. As, however, the state was permitted to show by the witness Roland Garth that the defendant, in substance, had requested *him* to steal goods and bring them to him, and as the evidence showed that for some time the defendant had been a small trader, the above evidence was calculated to create in the minds of the jury the suspicion that "Jeff Peck" and "the little low man" were also thieves in the employ of the defendant, and to unduly prejudice them against the defendant. The above quoted evidence, to which the defendant objected, was on its face irrelevant. It had no legitimate tendency to show that the defendant was guilty of the larceny of the hack—the offense for which he was being tried—and the above discussion of that evidence is had for the purpose of showing that its introduction was not only probably not harmless, but tended to the prejudice of the defendant. The defendant was, undoubtedly, a small trader, and as the negro Garth testified that the defendant undertook to get him to steal for him, and as the evidence of the witness Bains showed—if believed—that he was, at least on one occasion a partner in crime with the defendant, the above evidence *may* have created in the minds of the jury—it certainly could not have had any *other* effect—the suspicion that "Jeff Peck" and the "little low man" were also engaged in criminal operations with the defendant, although there was *no* evidence that they were, in fact, engaged by the defendant to obtain by stealth or otherwise articles for him, and although there was no evidence that the saddles and harness were in fact stolen, or that, if they were stolen, the defendant, when he came into the possession of them, knew that they were

stolen. In fact, the above irrelevant testimony, which, when the trial court permitted its introduction, may have appeared to have been harmless, is an apt illustration of the wisdom of the law in requiring trial courts to admit in evidence only relevant testimony.

This apparently harmless evidence, when colored by the subsequent testimony of the witness Garth that the defendant had asked him to *steal* for him, coupling Bains' name in such a way with that request as to indicate that Bains, at least, was similarly engaged, gave to that testimony an insidious tendency, and injected into the case a consideration which the facts did not warrant, viz., that the defendant and Bains may have stolen, or that the defendant may have received from two *possible* confederates in crime, "Jeff Peck" and "the little low man," knowing that they had been stolen for his benefit, the saddles and the harness—considerations utterly unwarranted by the evidence. "Rumors and suspicions may be born of such facts," but such facts cannot properly be admitted in evidence before a jury, and thereby possibly influence their verdict.—*Gassenheimer's Case, supra.*

We are therefore of the opinion that the trial court was in error in permitting the witness Bains to testify, as shown in the above opinion, and that we cannot hold that the evidence was not prejudicial to the defendant. The judgment of the court below is reversed, and the cause remanded.

Reversed and remanded.